**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MICHAEL BURKE, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 10-1805 (RC) |
| | : | | |
| v. | : | Re Document No.: | 21 |
| | : | | |
| INTER-CON SECURITY SYSTEMS, INC., | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

This is a discrimination case.  The plaintiff claims that he was temporarily suspended and laterally transferred due to gender discrimination, and that he was later suspended for five days as a form of retaliation for initiating this lawsuit.  The defendant argues that the plaintiff was initially suspended and transferred due to reports that he physically threatened a coworker, and that his later suspension was ordered because the plaintiff failed to show up to work.  Because the plaintiff has failed to submit enough evidence to convince a reasonable jury that the defendant's reasons for acting are mere pretext, the court will grant the defendant's motion for summary judgment.

## II. FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

### A. The Parties

Defendant Inter-Con Security Systems, Inc.  ("Inter-Con"), a California company that provides security services to buildings used by the U.S. Department of State.  Def.'s Stmt. of Facts ¶¶ 1–2.  The plaintiff has been employed by Inter-Con to guard the State Department's buildings in Washington, D.C. since July 2008.  *Id.* ¶ 6.

### B. An Incident on New Year's Eve

Around November 2009, Burke entered into a consensual relationship with a co-worker, Tonya Jackson. *Id.* ¶ 7.  Jackson alleges that, during the course of her brief relationship with Burke, he was verbally abusive, engaged in threatening behavior, and made threatening statements.  Def.'s Mot., Ex. 3 (Jackson Depo.)[1] at 88, 91–95.  Burke denies these allegations. *Id.*, Ex. 2 (Burke Depo.) at 195–97.   It appears that things came to a head on December 31, 2009.  That night, Burke drove Jackson to work.  Burke Depo. at 203–04, 219.  Jackson alleges that he made threatening statements to her.  Jackson Depo. at 38, 90–92.  Jackson also alleges that, as their conversation got heated, Burke snatched a cell phone from her hand.  Burke Depo. at 224–25.  Burke claims that her allegations are largely unfounded.  Pl.'s Mot, Ex. 4 (Burke Decl.) ¶¶ 14–15.

Shortly before 10:00 p.m., Burke dropped Jackson off.  Def.'s Stmt. of Facts ¶ 24.  After driving away, Burke called Jackson's office repeatedly, but she did not pick up the phone.  Burke Depo. at 228.  Burke then returned to Jackson's building and used his security key card to gain entry through a rear door.  *Id.* at 232–34.  Once he found Jackson, Burke resumed their conversation.  *Id.* at 234.  Jackson did not reciprocate; she left the room and Burke followed her down the hall.  Jackson Depo. at 106–07.  There, Jackson found another individual who was on duty, Officer Washington.  *Id.* at 236.  When he saw the two, Officer Washington sensed that something was wrong.  Def.'s Mot., Ex. 6 (Washington Depo.) at 35–36.  He observed that Jackson appeared to be "nervous" and that "her body was shaking."  *Id.* at 33.  Jackson eventually called a supervisor and asked to be moved to a new location for the remainder of her shift, as she did not feel safe.  Jackson Depo. at 86–87, 108.  Jackson's request was relayed to

---

[1]  Since the lawsuit was filed, Tonya Jackson changed her name to Tonya Gallion.  Def.'s Mot, Ex. 3 at 5. For the purposes of consistency, the court will refer to her as Ms. Jackson.

2

Senior Vice President of Operations Gerard Neville.  Def.'s Mot., Ex. 5 (Neville Depo.) at 51–52; Jackson Depo. at 87.  Based on the information he received, Neville concluded: "there was concern for potential for future workplace violence and until I could meet with Mr. Burke and get his side of the story, I had no other option but to remove him from the [work] schedule." Neville Depo. at 9.

### C. Neville Suspends Burke for a Week and Gathers the Facts

Neville demanded that Burke be suspended and that he report for an interview on the morning of January 4, 2010.  Def.'s Stmt. of Facts ¶ 56.  Burke asked to be interviewed the following week, as that was the earliest time that he could secure union representation for the interview, which took place on January 11, 2010.[2]  Burke Depo. at 246.  Burke did not work any shifts between January 1 and January 10.  Id.  After interviewing Burke, Neville concluded that the confrontation between Burke and Jackson was an isolated incident and was therefore unlikely to recur.  Neville decided to put Burke back to work soon after the interview.  Neville Depo. at 60–62.  Burke did not receive any back pay for the shifts that he lost.  Id. at 10–11; Burke Depo. at 134–35.

### D. Burke is Reinstated and Relocated

After reinstating Burke, Neville ordered a full investigation into the New Year's Eve incident.  Def.'s Stmt. of Facts ¶ 74.  After the investigation ran its course, Neville concluded that there was no reason to believe that Burke had committed any threatening behavior.  Neville Depo. at 60–62.  Jackson was disciplined for conducting personal business while on duty, carrying an unauthorized personal handbag, using an unauthorized cell phone, and failing to self-issue a weapon.  Def.'s Stmt. of Facts ¶ 77.  She also was demoted from sergeant to officer with a reduction in pay.  Id.  Neville decided to assign Jackson and Burke to separate areas so their

---

[2]     Burke had a right to secure representation under a collective bargaining agreement.

paths would no longer cross.  *Id.* ¶ 81.  Although Jackson was relocated to Virginia, Burke was permitted to remain in his assigned geographic area.  *Id.* ¶ 85.  The plaintiff claims that Jackson requested this transfer.  Pl.'s Opp'n, Ex. 7.

Burke was asked to work at a different location, and that resulted in his having to work on different days of the week.  *Id.* ¶ 88.  Burke claims that this schedule makes it harder for him to enroll in courses for a Certified Information Systems Security Professional program that was provided by an outside organization.  Burke Depo. at 261–63.

### E. November 18, 2010: Burke Does Not Show Up to Work

There is some disagreement as to what happened in the early hours of November 18, 2010.  That night, one of the plaintiff's supervisors, Sergeant Andel Clarke, was under the impression that the plaintiff was scheduled to begin a work shift at 4:00 a.m.  Def.'s Stmt. of Facts ¶ 101.  Clarke called the plaintiff and left several messages on his phone, indicating that his presence was expected.  *Id.* ¶ 110.  About an hour later, Clarke re-checked the weekly schedule and saw that Burke's name did not appear on a list of employees who were scheduled to work. *Id.* ¶ 111.  He then called Burke back to say that there had been a mix-up, and that Burke should disregard his earlier messages.  *Id.*  An hour later, a second supervisor—Lieutenant McCullough—took over for Clarke.  *Id.* ¶ 112.   Lieutenant McCullough found a signed piece of paper indicating that the plaintiff was scheduled to work that morning.  *Id.*  McCullough then wrote up Burke as a no-show for the night's shift.  *Id.* ¶ 113.

Inter-Con conducted an investigation and obtained a written statement from Sergeant Alvin Bowe, who indicated that he personally had handed the schedule receipt to Burke and had watched him sign it.  Neville Depo. at 103–04; Def.'s Mot, Ex. 7 (Bowe Depo.) at 35–36.  Under the terms of Inter-Con's disciplinary policy, the November 18 incident resulted in a five-day

suspension.  Neville Depo. at 102–03; Neville Depo. Ex. 3.  Burke maintains that he never

received any notice of the amended schedule for November 18, 2010, and he maintains that his

signature was forged.  Burke Decl. ¶ 35.

On December 2, 2010, while Inter-Con was still investigating Burke's forgery claim,

Burke called off for his scheduled shift yet again.[3]  Neville Depo., Ex. 3.  Under Inter-Con's

disciplinary policy, this would have justified Burke's termination.  *Id.*  Instead of terminating

Burke's employment, however, Inter-Con appears to have chosen a less harsh form of discipline:

Burke was suspended for five days.  Neville Depo. Ex. 3 ("[T]he Company understands that

because the investigation into your forgery allegations was in process . . . you may not have

appreciated and understood that your December 2, 2010 Non-Medical Call-Off would . . .

result[] in termination of your employment.  As a result of this confusion, the company has

chosen to forego discipline for your December 2, 2010 Call-off.").

### F. Burke Files Suit

The plaintiff filed suit under the D.C. Human Rights Act, D.C. Code § 2-1402.01 *et seq.*,

alleging that he was the victim of gender discrimination (Count I) and retaliation (Count II).  The

plaintiff initially alleged that he was the victim of sexual harassment and a hostile work

environment, Am. Compl. ¶ 20, but he failed to oppose the defendant's motion for summary

judgment on these claims both in his opposition and in his sur-reply.  *See* Def.'s Reply at 1–2

(noting the plaintiff's failure to oppose summary judgment on these claims); *see generally* Pl.'s

Sur-Reply (failing to oppose the defendant's motion for summary judgment on these claims).

Accordingly, the court will deem that the plaintiff has conceded the defendant's arguments on

those claims.

---

[3]      The court understands this to mean that Burke called in advance of a work shift to let a superior know that
he would not be present for the shift.

### III. ANALYSIS

### A. Legal Standard for Summary Judgment

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. *Id.* at 323; FED. R. CIV. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials"). In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine issue that is suitable for trial. *Celotex*, 477 U.S. at 324.

On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## B. Legal Standard for a Discrimination Claim under the DCHRA

The plaintiff brings suit under the D.C. Human Rights Act ("DCHRA"), which is analyzed under the same burden-shifting framework that is used to assess Title VII claims.[4] *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010). The DCHRA prohibits employers from discriminating against their employees on the basis of gender. D.C. CODE § 2– 1402.11(a)(1). To resolve the plaintiff's claims, the court must answer two questions. First: has the plaintiff alleged that he suffered a materially adverse employment action? If not, his claim is not actionable. Second, if the plaintiff has alleged such a harm but the defendant has articulated a legitimate, non-discriminatory reason for its actions, the court must ask: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008). A plaintiff has "multiple ways" to cast doubt on the employer's asserted reason for acting: for instance, the plaintiff may draw comparisons to others who are similarly situated, the plaintiff may submit evidence suggesting that the employer has lied about the underlying facts, or the plaintiff may suggest the employer failed to follow established protocol. *Id.* at 495.

## C. The Court Will Grant Summary Judgment on Count I

The plaintiff's discrimination claim has two components. First, he claims that he was the victim of discrimination when he was laterally transferred and his schedule was altered. Second, he claims that he was the victim of gender discrimination when he was suspended without pay in the days following the New Year's Eve incident. The court will consider each allegation in turn.

---

[4]     Federal jurisdiction exists because of diversity between the parties; the defendant is headquartered in California, and the plaintiff resides in Washington, D.C. *See* Compl. at 1 (case caption); Notice of Removal ¶ 3.

**1. Burke's Lateral Transfer and Schedule Change**

**i. The Plaintiff Has Not Shown That His Transfer Was an Adverse Employment Action**

The plaintiff complains that the defendant exhibited gender bias by altering his schedule following the New Year's incident. Pl.'s Opp'n at 10. According to the plaintiff, "[t]hese erratic schedules meant that Plaintiff was unable to enroll in a certification program" that was provided by an outside organization. *Id.* The defendant claims that the change in schedule was a trivial inconvenience, not an adverse employment action. Def.'s Mot. at 19.

A discrimination claim is actionable only if the plaintiff first shows that he suffered an "adverse employment action." *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008). For discrimination claims, an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). Thus, an employee must "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (distinguishing between "purely subjective injuries" which are not actionable, and "objectively tangible harm," which is). A materially adverse employment action "must be more disruptive to the conditions of employment than a mere inconvenience or an insignificant alteration in job responsibilities." *Hunter v. Rice*, 480 F. Supp. 2d 125, 133 (D.D.C. 2007). In sum, "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).

Generally, "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Brown v. Brody*, 199 F.3d 446, 455–56 (D.C. Cir. 1999). Burke does not allege that his transfer resulted in a demotion in form or substance, or even a change, significant or otherwise, in his job responsibilities. Burke alleges that his schedule change was, in fact, adverse because it impaired his ability to enroll in an outside certification program. But there is no evidence to support the claim. After the New Year's incident, Burke was asked to work on Tuesday, Wednesday, and Thursday nights; his classes are offered on Saturdays. Pl.'s Opp'n, Ex. 4 ¶ 32. If anything, a change in schedule from working Friday nights to working in the middle of the week would make it easier to attend classes on Saturdays. Put simply, the plaintiff has not submitted any evidence of a scheduling conflict.[5] Thus, no reasonable juror could conclude that the plaintiff suffered an objectively tangible harm that constitutes a "significant change in employment status." Accordingly, the plaintiff has failed to allege any actionable harm. *See Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 149 (D.D.C. 2010) ("Being denied the ability to work from home on, at most, three occasions is a minor annoyance, not an adverse action.").

### ii. In the Alternative, the Court Concludes That the Plaintiff Has Not Submitted Evidence to Convince a Reasonable Jury that the Defendant's Reasons for Acting Were Pretext

Even if the court assumed that the schedule change was an actionable harm, the plaintiff lacks enough evidence to convince a reasonable jury that the transfer was discriminatory. The plaintiff claims that his transfer was motivated by gender discrimination. The defendant explains that the plaintiff's schedule was altered in order to avoid any future potential for future

---

[5]    The defendant has also submitted a copy of email correspondence from an employee of the organization, who indicated that the classes were readily available online. Def.'s Reply. Ex. 2 (Wolfgang Decl.), Ex. C. Although the plaintiff challenges the admissibility of this evidence, the court need not weigh in on the matter. Although it appears to the court that this email could easily be converted to admissible evidence, the plaintiff's failure to demonstrate any scheduling conflict ends the relevant inquiry.

workplace violence between Jackson and Burke.  It thus falls on the plaintiff to show that this reason is mere pretext.  *Brady*, 520 F.3d at 493–94.  The only evidence submitted by the plaintiff on this score is a putative discrepancy in Neville's testimony and the purported more favorable treatment received by Jackson.  Pl.'s Opp'n at 10.

At his deposition, Neville claimed that he switched the plaintiff's schedule and place of work, stating that the plaintiff was getting "too familiar" with the area where he bypassed security procedures.  Def.'s Stmt. of Facts ¶ 86.  The plaintiff asks how a security guard could be "too familiar" with a job, as on-site familiarity is ostensibly a positive trait.  But the plaintiff takes the statement out of context: the defendant argues that Burke "had become too familiar *with how to circumvent the security procedures*" at the building.  *Id.* (emphasis added).  As always, context is key.  Here, Neville's statement is reasonably read to be a delicately phrased criticism of the plaintiff's decision to enter someone else's work area, through an un-manned entrance, for personal (and possibly disruptive) reasons.  The court concludes that this testimony could not convince a reasonable jury that Neville's stated decision was pretext, and that the actual reason for the transfer was discrimination.  Thus, the plaintiff's transfer claim would fail and warrant summary judgment even if it were an actionable harm.

The plaintiff also alleges that Jackson "got what she wanted" in that she requested a transfer to Virginia.  Pl.'s Mot. at 11.  The plaintiff concludes that their disparate treatment is evidence of gender discrimination.  *Id.* ("Thus, it appears that Defendant treated the two parties to this personal dispute differently: despite having no evidence to support any allegations that Plaintiff presented any danger to Jackson, Jackson got from Defendant what she asked for. Meanwhile, Plaintiff was transferred to a different location and given a wholly erratic set of new hours, effectively punishing him for having been the subject of an unfair workplace allegation of

violence."). First of all, the analogy falls apart because the two are not similarly situated: Jackson and Burke held different positions, which necessarily entailed different job functions and responsibilities. *See Martin v. Locke*, 659 F. Supp. 2d 140, 157 (D.D.C. 2009) (noting that an employee was not similarly situated to her manager); *Laurent v. Bureau of Rehabilitation, Inc.*, 544 F. Supp. 2d 17, 23 (D.D.C. 2008) (noting that the plaintiff was not similarly situated to other employees because they were not supervisors). Second of all, there is no evidence that Burke was treated less harshly than Jackson. Jackson was disciplined for conducting personal business while on duty, carrying an unauthorized personal handbag, using an unauthorized cell phone, and failing to self-issue a weapon. Def.'s Stmt. of Facts ¶ 77. She also was demoted from sergeant to officer with a reduction in pay. *Id.* In contrast, Burke was not disciplined, nor was he demoted, nor was his pay reduced. In the court's view, there is no evidence that Burke was treated less favorably because of his gender. Accordingly, the court concludes that no reasonable juror could deem Neville's stated reason for acting to be a pretext to cover gender discrimination.

## 2. Burke's Suspension Without Pay

Burke was suspended from work following the New Year's Eve incident, and he contends that this decision was motivated by gender bias. The defendant instead argues that Burke was temporarily suspended until it was clear that he did not pose a threat to other employees. Because the defendant has offered a legitimate, nondiscriminatory reason for acting, the *prima facie* case drops out of the picture, and the plaintiff must show that the defendant's stated reasons for acting were mere pretext. *Brady*, 520 F.3d at 493–94; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973) (noting that the plaintiff may prove that even a presumptively valid reason may be "a coverup" for a "discriminatory decision"); *see also*

11

*Palmquist v. Shinseki*, 689 F.3d 66, 71 (1st Cir. 2012) ("When . . . the employee makes out a prima facie case of retaliation and the employer proffers a justification for the challenged action, the *McDonnell Douglas* framework, with its intricate web of presumptions and burdens, becomes an anachronism.")

A plaintiff can demonstrate that the defendant's stated reason is pretext by showing that the employer treated people differently on the basis of their gender—provided that the employees are otherwise similarly situated. *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (holding that a coworker is similarly situated only if "all of the relevant aspects of [the plaintiff's] employment situation were nearly identical" to those of the coworker). Here, the plaintiff appears to argue that Neville should have demonstrated gender equanimity by suspending both Jackson and Burke. Pl.'s Opp'n at 7. But Burke and Jackson are not similarly situated: Burke was accused of acting in a threatening manner; Jackson was not. *See Turner v. Fed. Law Enforcement Training Ctr.*, 527 F. Supp. 2d 63, 73–74 (D.D.C. 2007) (concluding that employees were not similarly situated because the plaintiff engaged in aggressive behavior whereas other coworkers did not); *see also McKinney v. Bennett*, 2009 WL 2981922, at *7 (S.D.N.Y. Sept. 16, 2009) (concluding in context of a 42 U.S.C. § 1981 claim that "there is no dispute that" victims of aggressive behavior "were different because they were [the plaintiff's] victims and are therefore incapable of being similarly situated to McKinney, their aggressor."); *Blake v. Potter*, 2007 WL 2815637, at *7 (S.D.N.Y. Sept. 25, 2007) (plaintiff who was involved in a physical altercation with a fellow employee was "no longer similarly situated" to her victim). Because Jackson and Burke are not similarly situated, any comparison drawn between the two fails to yield an inference of pretext.

Burke puts forth several other arguments, but these are simply attempts to second-guess the wisdom of his employer's acts.  First, the plaintiff argues that it was unfair for Neville to suspend him before first hearing Burke's side of the story.  Pl.'s Opp'n at 9.  The defendant counters that it has a gender-neutral policy of suspending people who are accused of potentially violent behavior.  Def.'s Reply at 3; Def.'s Mot., Ex. 1 (Neville Aff.) ¶ 20.  There is no evidence that the defendant deviated from this protocol, employed it selectively, or employed it in a biased manner.  *See Brady*, 520 F.3d at 496 (noting that "an employer does not engage in discrimination" by "strictly and uniformly enforcing a policy" designed to deter unlawful conduct).[6]

Second, the plaintiff argues that he should have received a temporary assignment while Neville's investigation was underway.  Pl.'s Opp'n at 7–8.  But this again boils down to an attempt to micromanage the defendant's employment policies.  As it has been often noted, the judiciary does not stand in as a "super-personnel department that reexamines an entity's business decisions."  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)); *see Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (noting that "the employee cannot succeed by simply quarreling with the wisdom of" the employer's stated reason for acting).  The plaintiff has not demonstrated that a similarly situated female employee who was similarly accused of workplace violence was re-assigned under the anti-violence policy rather than suspended.

---

[6]     It is not even clear that a total failure to investigate the incident would necessarily violate Title VII.  *See Rivera–Aponte v. Rest. Metropol # 3, Inc.*, 338 F.3d 9, 11–12 (1st Cir. 2003) (holding that the cursory nature of a pre-termination investigation and the failure to consult the plaintiff for his side of the story did not indicate that the termination decision was made with discriminatory animus); *Loya v. Sebelius*, 840 F. Supp. 2d 245, 254 (D.D.C. 2012) (in proving pretext for retaliation claim, "[f]ailure to investigate allegations of misconduct does not by itself raise the inference that the allegations were not the real reason for the employment action").

Third, the plaintiff claims that he never posed any threat to Jackson, and that his suspension was ultimately unwarranted. Pl.'s Opp'n at 9. This is irrelevant. "The question is not whether the underlying . . . incident occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying . . . incident occurred." *Brady*, 520 F.3d at 496. Neville received word that Burke had acted in a threatening manner, and that Jackson was shaken up by the incident. Neville Depo. at 21–26. The claim was corroborated, in part, by a disinterested third party: Officer Washington. At that point, any employer in Neville's shoes would be fully justified in suspending the employee while determining what actually occurred. *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("An employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[T]he issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers."); *Adewole v. PSI Servs., Inc.*, 798 F. Supp. 2d 57, 62 (D.D.C. 2011) (observing that "a plaintiff seeking to show that a defendant's proffered explanations are pretextual must do more than simply show that those explanations are flawed or incorrect").

Finally, the plaintiff tries to show pretext by exploiting a potential discrepancy in Neville's testimony: the plaintiff alleges that Neville was lying when he testified that it that was "not an option" to put the plaintiff on a different shift immediately after the incident. Pl.'s Opp'n at 7–8. The plaintiff argues that this was untrue because Neville was able to swap Jackson to a different location on the night of the incident. But the relevant question is not whether it was operationally impossible to give the plaintiff temporary employment: instead, the court must ask whether it was an option under the employer's policy against workplace violence. And there is no evidence that it was. In any event, Jackson was temporarily replaced for the remainder of the

14

evening, whereas Burke sought temporary employment for a full week after the incident.  *See*

Def.'s Reply at 3, n.3.  Because the two individuals sought different types of reassignment, no

inference of pretext can be drawn from the comparison.  Because the plaintiff has not submitted

any evidence to suggest that Neville's stated reasons for acting are merely pretext, the court will

grant the defendant's motion for summary judgment on Count I.

### D. The Court Will Grant Summary Judgment on Count II

The plaintiff claims that the defendant retaliated against him by suspending him for five

days after he filed suit.[7]  Pl.'s Opp'n at 13.  The defendant instead maintains that the plaintiff

was disciplined for failing to show up to work on November 18, 2010.  Def.'s Mot. at 30.  Once

the employer presents a legitimate, non-discriminatory reason for its actions,  "a court reviewing

summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the

evidence," which includes the *prima facie* case as well as any evidence the plaintiff offers to

"attack the employer's proffered explanation for its action," and other evidence of retaliation.

*Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

Resolving this matter requires a brief tour of the defendant's employment procedures:

every week, the defendant issues a schedule for its employees.  *Id.*  If the defendant needs an

employee to work additional hours, a revised schedule is printed and presented to the employee,

who must sign the document.  *Id.*  By signing the revised schedule, the employee indicates that

he or she received notice of the schedule change and agrees to work the additional shift.  *Id.*

There is some degree of confusion as to what happened on the night in question.  At 3:15 a.m. on

November 18, 2010, Sergeant Clarke commenced roll call to determine whether all personnel

were present.  Neville Aff. ¶ 28.  Clarke was under the impression that Burke was scheduled to

---

[7]      The plaintiff initially alleged that the suspension he received in December 2010 was a form of retaliation,
Am. Compl. ¶ 23, but he no longer appears to pursue this claim in his opposition or sur-reply.

work that night's shift.  Def.'s Mot. Ex. 7 (Clarke Depo.) at 21–22.  Clarke called Burke and left

several messages on his phone.  *Id.* at 34–35.  About an hour later, Clarke re-checked the weekly

schedule and saw that Burke's name was not listed.  *Id.* ¶ 111.  He then called Burke back and

indicated that there had been a mix-up, and that Burke should disregard his earlier messages.  *Id.*

An hour later, Lieutenant McCullough took over for Clarke.  *Id.* ¶ 112.  McCullough somehow

retrieved an amended work schedule, which bore the plaintiff's signature.  *Id.*  This document

indicated that Burke had agreed to appear for a four-hour work shift that morning.  *Id.*  Burke

was then reprimanded for missing a work shift.  Def.'s Stmt. of Facts ¶ 113.  The reprimand

resulted in a five-day suspension.  *Id.* ¶ 116.

Reviewing these facts, the court finds little evidence of pretext.[8]  First of all, the

defendant has submitted evidence to the effect that the two individuals who wrote up Burke had

no knowledge of this lawsuit.  *See* Def.'s Stmt. of Facts ¶ 112.  And while the plaintiff "needn't

provide direct evidence that his supervisors knew of his protected activity," *Jones v. Bernanke*

557 F.3d at 670, a plaintiff must show that the individuals who made the retaliatory decision

"had knowledge of [his] protected activity." *Talavera v. Shah*, 638 F.3d 303, 314 (D.C. Cir.

2011).  If a plaintiff "offer[s] only evidence from which a reasonable jury would have had to

speculate that [the supervisor] knew" of the protected activity, that evidence "is insufficient to

defeat summary judgment."  *Id.*  Here, there is no evidence that McCullough, Rowe, or Clarke

---

[8]     The court pauses to observe that Burke was suspended only two months after he filed the discrimination
suit.  And temporal proximity between a discrimination complaint and a retaliatory act may provide some
evidence of causation.  *Patterson v. Johnson*, 505 F.3d 1296, 1299 (D.C. Cir. 2007).  On the other hand,
"[p]ositive evidence beyond mere proximity is required to defeat the presumption that the proffered
explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *Pendleton v. Holder*,
697 F. Supp. 2d 12, 23–24 (D.D.C. 2010) (granting summary judgment for employer where plaintiff's
"*only* evidence of retaliation is the temporal proximity between his protected activity and his non-selection"
for a position).  For the reasons explained below, the fact of timing alone would not allow a reasonable jury
to find in the plaintiff's favor.

had any knowledge of the plaintiff's lawsuit. Thus, there is no reason to assume that they acted with retaliatory intent.

Second, Burke wagers his entire claim on the assertion that the facts motivating his suspension did not occur. Pl.'s Opp'n at 13–14 ("It would be outrageous to permit Defendant to discipline Plaintiff for missing a work shift which he had no actual notice that he was expected to work."). Specifically, Burke claims that he never received a copy of the amended schedule, and that his signature was forged. Burke Decl. ¶ 35 ("With respect to the schedule indicating that I was expected to work on November 18, 2010, I never signed the schedule receipt accepting that date. Any document that bears my signature indicating my acceptance of the schedule receipt for that date is a forgery."). But this argument is misdirected. Burke was suspended after Neville conducted an investigation into the underlying acts. When an adverse action results from such an investigation, "[t]he question is not whether the underlying . . . incident occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying . . . incident occurred." *Brady*, 520 F.3d at 493–94. Here, Neville obtained written statements from the people that were present when Burke signed the schedule. Neville testified as follows:

> When we went to serve the discipline [for the November 18 no-call/noshow], it was sent back to the field to be issued to Mr. Burke. He said [he] never signed the schedule for that receipt. When he was showed the schedule that he did sign for that receipt, he alleged that somebody forged his name. At that point I was notified of the allegation that he had made. I said hold the discipline, don't give it to him, let's investigate it. We brought the discipline back in; we set it aside; we investigated it. We got written statements from the people that were present when he signed the schedule and we are confident that he signed the schedule himself.

Neville Depo. at 103–04. There is no evidence that Neville harbored anything other than a good faith belief in the investigation's results. Although the plaintiff claims that Neville's investigation was insufficient, Pl.'s Mot. at 14, he fails to submit any evidence to support this allegation. For example, he claims that Neville should have consulted the plaintiff during the

investigation.  But Neville did offer to do so—and the plaintiff refused the meeting.  Neville

Depo. at 109–10 ("I was fully prepared to discuss this with Mr. Burke but Mr. Burke refused to

meet with me.").  Regardless, everyone knew Burke's position that the document was forged.  In

addition, the plaintiff questions the defendant's decision to call some witnesses but not others.

This focus on the defendant's evidence is again misdirected.  The defendant need not prove the

existence of a legitimate, non-discriminatory reason for acting.  The defendant need only

articulate one.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  The relevant

question is whether the plaintiff has submitted enough evidence for a reasonable jury to consider

that reason to be a subterfuge.  Because the plaintiff has failed to produce any evidence

suggesting that the complaining witnesses harbored retaliatory intent or that the investigation

was simply a coverup for retaliation, the court will grant the defendant's motion for summary

judgment on Count II.

## IV. CONCLUSION

For the aforementioned reasons, the court will grant the defendant's motion for summary

judgment.   An order consistent with this memorandum opinion is separately issued this 4th day

of March, 2013.

RUDOLPH CONTRERAS
United States District Judge
